IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| **TERESA WEBB, FOR D.E.A.W.,** ) ) ) | |
| ) | Case No.1:08CV00051 |
| Plaintiff, ) | |
| ) | **OPINION** |
| v. ) | |
| ) | By: James P. Jones |
| **MICAHEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,** ) ) ) ) | Chief United States District Judge |
| ) | |
| Defendant. ) | |

*E. Craig Kendrick*, Browning, Lamie & Gifford, P.C., Abingdon, Virginia, for Plaintiff; Andrew C. Lynch, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.

In this social security case, I affirm the final decision of the Commissioner.

I

Teresa Webb filed this action on behalf of her son, "D.W.", a minor, challenging the final decision of the Commissioner of Social Security ("Commissioner") denying D.W.'s claim for childhood supplemental security income ("SSI") benefits under title XVI of the Social Security Act ("Act"), 42 U.S.C.A. §§

1381-1383(f) (West 2003 & Supp. 2009). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 1383(c)(3).

In Social Security cases where the claimant is under the age of eighteen, the ALJ's determination of disability follows a three-step process rather than the usual five-step process used for determining adult disability. *See* 20 C.F.R. § 416.924 (2008). However, my review under the Act is the same in cases involving both adults and minors—it is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Id.*

Webb applied for benefits on behalf of her son on April 12, 2005, alleging that he had been disabled since August 1, 1999. (R. at 11, 39.) This claim was denied initially and on reconsideration, and Webb received a hearing before an administrative law judge ("ALJ") on January 9, 2007. (R. at 26, 34, 253-72.) The claimant was represented by counsel, and the claimant's mother testified. (R. at 11, 253-72.) By decision dated February 9, 2007, the ALJ found that the plaintiff was not

disabled within the meaning of the Act. (R. at 11-18.) The Social Security Administration's Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner.

The parties have briefed the issues, and the case is ripe for decision.

II

The summary judgment record reveals the following facts. D.W. was born in 1997, and was two years old on the alleged disability onset date. (R. at 39.) He has not engaged in substantial gainful activity since the alleged onset date. (R. at 12.) D.W. obtained special education services in public school, but is presently homeschooled by his mother. (R. at 16, 223-38.) He has completed the first grade. (R. at 76.) D.W. claims disability based on attention deficit hyperactivity disorder, hearing problems, rage, and inability to read. (R. at 12.)

The plaintiff was seen by James M. Wade, M.D., for hearing problems from January 21, 2003, through June 2, 2005. (R. at 102-15.) On January 21, 2003, the plaintiff was diagnosed with chronic serous otitis, right ear, with conductive hearing loss, and chronic otitis media, left ear, with cholesteatoma. (R. at 114.) Dr. Wade stated that D.W. would need to have surgery on the left ear to remove the cholesteatoma. (R. at 114.)

On March 11, 2003, the plaintiff underwent surgery at the University of Virginia hospital. (R. at 116.) John C. Mason, M.D., performed a right myringotomy with tympanostomy tube placement, left intact canal wall mastoidectomy, left tympanoplasty, and intraoperative facial nerve monitoring. (R. at 116-19.) On June 17, 2003, D.W. underwent a second follow-up surgical procedure at the same hospital. (R. at 136.) Dr. Mason performed a left cartilage tympanoplasty, left ossicular chain reconstruction, left tragal cartilage harvest, and intraoperative facial nerve monitoring. (R. at 136-39.) On April 22, 2005, a final postoperative report was given by George Hashisaki, M.D. (R. at 144-45.) The report indicated that D.W.'s hearing had stabilized. (R. at 144.) D.W. did have conductive hearing loss in the left ear, but there was no evidence of recurrent cholesteatoma. (R. at 144.)

During a postoperative follow-up visit with Dr. Wade on January 20, 2004, the plaintiff's mother reported that D.W. was not complaining of any pain in the ears, but that he was talking very loudly. (R. at 109.) Dr. Wade reported that he did not see a need for amplification in the left ear, since D.W. was having no problems understanding what his mother was saying. (R. at 109.) On May 20, 2005, however, Dr. Wade noted conductive hearing loss in the left ear that was probably related to poor fit of the prosthesis. (R. 104.) On June 2, 2005, D.W. was fitted with a hearing aid for the left ear. (R. at 102.)

D.W. was treated at C-Health by Brian Easton, M.D., and Samuel Melton, M.D., between May 19, 2003, and May 9, 2005, for several minor ailments including earaches and ear infections, sore throat, fever, and cold symptoms. (R. at 121-34.) On November 5, 2003, the plaintiff was diagnosed as a "hyperactive child" and referred to a psychologist. (R. at 129-30.)

On November 10, 2004, Sharon Hughson, Ph.D., conducted a consultative examination of the plaintiff. (R. at 149-53.) Dr. Hughson reported that the plaintiff's activity level during the examination was not bad and that he was well behaved. (R. at 150-51.) Even though the plaintiff's mother noted that he was hyperactive, Dr. Hughson reported that his activity level was not out of the ordinary for a child his age. (R. at 152-53.)

During the examination, the plaintiff stated that he had friends and enjoyed playing hide and seek with them. (R. at 150.) While the plaintiff denied having any problems getting along with others, his mother reported that he had a great deal of problems in this area. (R. at 151.) The plaintiff's mother also stated that D.W. could not concentrate, but Dr. Hughson reported that he followed the interview questions without any apparent difficulty. (R. at 152.) Dr. Hughson stated that D.W. had no difficulty communicating. (R. at 153.) She gave him a Global Assessment of Functioning ("GAF") score of sixty-one. (R. at 152.)

On December 27, 2004, D.W. saw Al Cervantes, M.D. (R. at 154-56.) He was diagnosed with attention deficit hyperactivity disorder, combined type, and was prescribed adderall. (R. at 156.) Dr. Cervantes also noted that D.W.'s GAF score was sixty-five and that his prognosis was good. (R. at 156.)

On January 5, 2006, the plaintiff was given several tests by school psychologist Stasia Harris. (R. at 228-31.) Ms. Harris reported that D.W.'s verbal reasoning abilities as measured by the Verbal Comprehension Index were in the average range and above those of approximately forty-seven percent of his peers. (R. at 228.) Ms. Harris also stated that D.W.'s ability to sustain attention, concentrate, and exert mental control was in the average range. (R. at 228.) When assessing his "social emotional development," D.W.'s behavior at school was found to be in the normal range for boys his age. (R. at 230.) His adaptive functioning was in the low average range for children his age. (R. at 230.)

On January 17, 2006, D.W. was evaluated by Kathy Miller, M.Ed., a licensed psychological examiner. (R. at 169-74.) Ms. Miller noted that his general activity level was age and task appropriate, and that he was cooperative, socially confident, and comfortable during the evaluation. (R. at 169.)

During the examination, the plaintiff's mother reported that the plaintiff "raged" everyday after school, but that his teachers reported to her that his behavior

was very good at school and that he got along well with his peers. (R. at 170, 173.) The plaintiff stated that he got along well with his teachers and peers. (R. at 171.) Ms. Miller noted that his social skills were adequate, and that he was cooperative and related well with her. (R. at 171.) She concluded that the plaintiff's ability to understand was moderately limited, but that his ability to sustain concentration and persist, socially interact, and adapt was not significantly limited. (R. at 173-74.)

On January 31, 2006, D.W. was seen by Roy V. Thompson, M.D., for a consultative examination for disability determination services. (R. at 175-76.) Dr. Thompson concluded that the plaintiff had hearing loss, attention deficit hyperactivity disorder, and a learning disability. (R. at 176.)

On February 21, 2006, Daniel A. Hardwick, Psy.D., evaluated the plaintiff after he was referred to the Southwest Virginia Child Development Clinic for learning problems. (R. at 189-208.) During the evaluation, the plaintiff's mother explained that D.W. was easily angered, but was well behaved at school. (R. at 193.) She stated that D.W. did not relate well with children in their neighborhood, but that he related fairly well with some of his peers at school. (R. at 194.) D.W. reported that he had many friends and denied any problems with peers or teachers. (R. at 195.) He described positive relationships with his parents and siblings. (R. at 195.)

Dr. Hardwick noted that the plaintiff attempted to present himself in an overly favorable manner on the Revised Children's Manifest Anxiety Scale ("RCMAS"), which raised questions about the validity of the Children's Depression Inventory ("DCI"). (R. at 195-96.) Dr. Hardwick recommended that D.W. continue to be treated in special education and continue to participate in psychiatric treatment for attention deficit hyperactivity disorder. (R. at 196-97.) He also recommended that D.W. be referred to a neurologist/neuropsychologist and a licensed mental health professional for individual therapy. (R. at 197.)

During a subsequent interview with the plaintiff's mother on February 24, 2006, she reported that D.W. got along with others most of the time. (R. at 199.) She stated that he had a good relationship with his father. She also stated that he liked to play with younger children, but that he slams the door, screams, and makes high pitched noises when he is angry. (R. at 200.)

The plaintiff was treated at Family Healthcare Associates of Southwest Virginia by Dwight L. Bailey, M.D., and Sandra Altenbach, Family Nurse Practitioner, from December 9, 2005, through August 14, 2006, for several minor ailments including sore throat, ear infection, and attention deficit hyperactivity disorder. (R. at 183-88.) He was prescribed Straterra for attention deficit hyperactivity disorder. (R. at 186-87.)

D.W. was treated by Ralph Ramsden, Ph.D., from July 24, 2006, through January 3, 2007, for anxiety, attention deficit hyperactivity disorder, and behavioral management. (R. at 241-52.) During most of these treatment sessions, D.W.'s activity level, affect, and thought processes were normal. (R. at 242, 244, 248.) Dr. Ramsden wrote a letter to Dr. Bailey on August 21, 2006, noting D.W.'s fear of his teachers and difficulty separating from his mother. On October 24, 2006, Dr. Ramsden noted that D.W. was "back on track" with his anger issues. (R. at 246.) During the last visit on January 3, 2007, Dr. Ramsden reported that D.W.'s attention deficit hyperactivity disorder was better with medication. (R. at 242.)

The plaintiff's mother completed three "Function Reports" as part of her son's SSI application. (R. at 42-71.) In the report completed on September 21, 2004, Webb stated that D.W. was able to get his point across when communicating, but that he was very loud due to hearing problems. (R. at 44.) She also reported that D.W. had friends his own age, could make new friends, generally got along well with her and other adults, and generally got along well with school teachers. (R. at 48.) In the report completed on May 12, 2005, however, Webb stated that the plaintiff had friends of his own and could make new friends, but that he did not generally get along well with her or other adults. (R. at 58.) She also noted that she was not sure if the plaintiff's communication was limited. (R. at 55.) In the report of December 19,

2005, Webb stated that D.W. could make new friends, and that he generally got along well with her, other adults, and school teachers. (R. at 68.) However, she reported that he did not have friends of his own. (R. at 68.)

The evidence in this case also includes testimony by the plaintiff's mother. (R. at 255-70.) Webb reported that D.W. had attention deficit hyperactivity disorder, rage, hearing problems, and was unable to read. (R. at 257-60.) She testified that D.W. generally did not have any trouble getting along with other children at school, except that he was easily intimidated. (R. at 260.) She stated that he had some problems with rage at school. (R. at 266.) Webb further stated that D.W. played with the neighborhood children, but that he got along better with the girls than the boys. (R. at 263, 267.) She also testified that D.W. got along with everyone. (R. at 265.)

### III

A disabled minor from a low-income family is entitled to receive children's SSI benefits under the Act. To qualify for such benefits, a child's income and assets—considering those imputed from the child's parents—must fall below a specified amount and the child must be "disabled." *See McClain v. Barnhart*, 299 F. Supp. 2d 309, 314 (S.D.N.Y. 2004). A minor is deemed "disabled" if the child "has a medically determinable physical or mental impairment, which results in marked and

- 10 -

Case 1:08-cv-00051-JPJ-PMS   Document 17   Filed 07/22/09   Page 10 of 17   Pageid#: 328

severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner's regulations set up a three-step process, that requires an ALJ to determine (1) that the child is not engaged in substantial gainful activity; (2) that the child has an impairment or combination of impairments that is severe; and (3) that the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. § 404 (2008). 20 C.F.R. § 416.924 (2008).

To determine whether a child's impairments functionally equal a listed impairment, the ALJ evaluates a child's functional limitations in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi) (2008).

These regulations provide that a child is "disabled" if he or she has an impairment or impairments of "listing-level severity," that is an "extreme" limitation in one of these domains or "marked" limitations in two or more domains. 20 C.F.R. § 416.926a(a) (2008). A marked limitation in a domain is found when an impairment interferes seriously with a claimant's ability to independently initiate, sustain, or

complete activities.  20 C.F.R. § 416.926a(e)(2) (2008).  An extreme limitation in a domain is found when the impairment interferes "very seriously" with a claimant's ability to independently initiate, sustain, or complete activities.  20 C.F.R. § 416.926a(e)(3) (2008).  "Extreme limitation also means a limitation that is more than marked."  *Id.*

The ALJ found that while D.W. had severe impairments, he did not have an impairment or combination of impairments that met or medically equaled a listing, or functionally equaled the severity of the listings set forth in the Listing of Impairments.  (R. at 18.)  Specifically, the ALJ found that D.W. had marked limitation of function in the area of acquiring and using information, but less than marked limitation of function in all five other domains.  (R. at 16-17.)

The plaintiff contends that the ALJ erred by finding that D.W. had less than marked limitations in the third domain of interacting and relating with others.  I disagree.

As stated above, the court's role in this case is limited to a determination of whether there is substantial evidence to support the Commissioner's final decision and whether the correct legal standard has been applied.  42 U.S.C.A. § 405(g); *see Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).  If substantial evidence exists, the final decision of the Commissioner must be affirmed.  It is the role of the ALJ to

resolve evidentiary conflicts, including inconsistencies in the evidence. It is improper for this court to reweigh the evidence presented to the ALJ. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) ("In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence"). It is not the role of this court to substitute its judgment for that of the Commissioner, as long as substantial evidence provides a basis for the Commissioner's decisions. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Here, there is substantial evidence in the record to support the ALJ's finding that D.W.'s limitation in the third domain was less than marked. The plaintiff generally claims that he had problems in the past getting along with others due to his attention deficit hyperactivity disorder. However, this statement is contradicted by substantial evidence and does not provide a reason to disturb the ALJ's well reasoned findings. Although the evidence suggests that D.W. had difficulties in the area of acquiring and using information, his ability to interact and relate with others was less than marked.

The plaintiff's mother testified that D.W. generally did not have any trouble getting along with other children at school, and that he played with the neighborhood children. (R. at 260, 263, 267.) She also testified that D.W. "gets along with everyone." (R. at 265.)

- 13 -

Although the three "Function Reports" completed by the plaintiff's mother as part of the children's SSI application conflicted, at least one of the reports stated that D.W. had friends his own age, could make new friends, generally got along with her and other adults, and generally got along with school teachers. (R. at 48.)

Dr. Hughson reported that D.W.'s activity level was not out of the ordinary for a child his age and that he was well behaved. (R. at 150-53.) He also stated that D.W. followed the interview questions without any difficulty and had no difficulty communicating. (R. at 152-53.) D.W. told Dr. Hughson that he had friends, enjoyed playing hide and seek with his friends, and did not have any problems getting along with others. (R. at 150-51.) D.W.'s GAF scores reflected only mildly impaired functioning. (R. at 152, 156, 173.)

When assessing the plaintiff's "Social Emotional Development," Ms. Harris found his behavior to be in the normal range for all boys. (R. at 230.) Similarly, his overall adaptive functioning was in the low average range for children of his age. (R. at 230.)

During his treatments with Dr. Ramsden, D.W.'s activity level, affect, and thought processes were generally normal. (R. at 242, 244, 248.) During his last visit on January 3, 2007, Dr. Ramsden reported that D.W.'s attention deficit hyperactivity disorder was better with medication. (R. at 242.) While Dr. Ramsden did write a

letter to Dr. Bailey on August 21, 2006, noting D.W.'s fear of his teachers and difficulty separating from his mother, this statement was contrary to numerous statements that D.W. got along well with his teachers and other people. (R. at 171, 173, 195, 265.)

Ms. Miller reported that D.W.'s social skills were adequate, that he related well with her, and that his behavior was age and task appropriate. (R. at 171.) She further noted that he was cooperative, socially confident, and comfortable during the examination. (R. at 169.) D.W.'s mother reported to Ms. Miller that his teachers stated he was well behaved and got along with his peers at school. (R. at 173.) Ms. Miller concluded that D.W.'s ability to sustain concentration and persist, socially interact, and adapt were not significantly limited. (R. at 173-74.)

While the plaintiff's mother told Dr. Hardwick that the plaintiff does not relate well with children in their neighborhood, she stated that he related fairly well with some of his peers at school. (R. at 194.) In a separate telephone interview, she reported that the plaintiff got along with others most of the time. (R. at 199.) The plaintiff denied any problems with his peers or teachers, and stated that he had many friends at school. (R. at 195.)

The plaintiff argues that the ALJ erred in not fully discussing the finding that D.W. attempted to present himself in an overly favorable manner while being

examined by Dr. Hardwick at the Southwest Virginia Childhood Development Center. Again, I disagree.

While the ALJ's opinion did not discuss this specific finding, the ALJ did consider the medical records from Dr. Hardwick at the Southwest Virginia Childhood Development Center. (R. at 14-15.) The court's task in reviewing the ALJ's decision is not to determine whether the ALJ explicitly mentioned every piece of evidence in his opinion, but rather to determine whether the ALJ's findings were supported by substantial evidence. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198 (3d Cir. 2008); *Mays v. Barnhart*, 227 F. Supp. 2d 443, 449-50 (E.D. Pa. 2002). As discussed above, the ALJ's decision is supported by a substantial amount of evidence.

In any event, to the extent that the plaintiff presented himself in an overly favorable manner, this finding was irrelevant to his ability to interact and relate to others, and was only related to the general assessment of the plaintiff's anxiety and depression. (R. at 195-96.) Thus, if the ALJ erred by not specifically discussing this finding, the error was harmless and does not warrant a remand or reversal. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to

remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

The record shows that the ALJ considered all of the relevant evidence—including objective clinical findings, physicians' reports, and treatment, as well as testimony by the plaintiff's mother—before concluding that D.W. had less than marked limitations in the area of interacting and relating with others. (R. at 17.)

Accordingly, I find that there is substantial evidence to support the ALJ's decision that D.W. had less than marked limitations in the area of interacting and relating with others.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the Commissioner's Motion for Summary Judgment will be granted. An appropriate final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: July 22, 2009

/s/ JAMES P. JONES
Chief United States District Judge